## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

FOREST GUARDIANS, et al.,

        Plaintiffs,

vs.                                                                   Civ. No. 06-231 WJ/KBM

UNITED STATES FISH AND WILDLIFE SERVICE,

        Defendant,

   and

THE PEREGRINE FUND,

        Defendant-Intervenor.


## MEMORANDUM OPINION AND ORDER DENYING CLAIM THREE IN REGARDS TO THE STATES OF NEW MEXICO AND ARIZONA AND DENYING CLAIMS FOUR, FIVE AND SEVEN OF PLAINTIFFS' PETITION FOR REVIEW OF AGENCY ACTION

THIS MATTER comes before the Court on Plaintiffs' Petition for Review of Agency Action ("Petition") (Doc. 46). The Court, having reviewed the instant Petition, Defendant's and Defendant-Intervenor's Responses (Doc. 50, 53), Plaintiffs' Replies (Doc. 59, 60), the May 20, 2008 oral arguments, the relevant law, and otherwise being fully informed, hereby denies claim three as moot in regards to the States of New Mexico and Arizona, and denies claims four, five and seven of Plaintiffs' Petition on the merits.

## I.  BACKGROUND

This case involves the Northern Aplomado Falcon ("Falcon"). Defendant United States Fish and Wildlife Service ("FWS" or "Defendant") declared the Falcon an endangered species in 1986. 50 C.F.R. § 17.11; 51 Fed. Reg. 6686 (Feb. 25, 1986). At that time, the Falcon had been

extirpated as a breeding species in the United States for over 30 years.  71 Fed. Reg. 42298-99;

51 Fed Reg. 6686-88.  Accordingly, Defendant also found "that designation of critical habitat is

not prudent for the northern aplomado falcon at this time."  51 Fed. Reg. at 6688.  Plaintiffs[1]

filed a September 2002 "Petition to the U.S. Fish and Wildlife Service to Revise the Critical

Habitat Designation for the Northern Aplomado Falcon" ("2002 Petition").  AR 55; Bates 509.[2]

The 2002 Petition requested that Defendant consider critical habitat designation within Texas,

New Mexico and Arizona.  On February 9, 2005, Defendant proposed the following in the

Federal Registry:

> We, the U.S. Fish and Wildlife Service (Service), propose to reintroduce northern aplomado falcons (Falco femoralis septentrionalis) (falcon) into their historic habitat in southern New Mexico and Arizona with the purpose of establishing a viable resident population. If this proposed rule is finalized, we may release captive-raised falcons as early as the summer of 2005 and release up to 150 additional falcons annually in the summer and/or fall for 10 or more years thereafter until a self-sustaining population is established. We propose to designate this reintroduced population as a nonessential experimental population (NEP) according to section 10(j) of the Endangered Species Act of 1973 (Act), as amended. The geographic boundary of the proposed NEP includes all of New Mexico and Arizona.

---

[1]  Plaintiff Forest Guardians prepared the pleadings and presented oral argument in this matter.  Additional Plaintiffs include Chihuahuan Desert Conservation Alliance, Public Employees for Environmental Responsibility, New Mexico Audubon Council, Sierra Club and Southwest Environmental Center.

[2]  This Memorandum Opinion and Order cites the Administrative Record as AR and indicates either the specific page a document starts on or specific pages within the document via Bates numbers (i.e., AR 1, Bates 1 or AR 1 at Bates 2-3).  The Main Section of the Administrative Record includes:  AR 1-11:  Drafts and Rules and AR 12-733:  Correspondence. The Supporting Documentation Section is AR 734-936 (Contaminants are AR 927-36).  The Environmental Analysis Supporting Index is AR 938-1038.  The Public Comments section includes:  AR 1039-1115:  general comments; AR 1116-26:  Peer Review Comments; AR 1127-68:  Comment Period 02/09/05-04/11/05; AR 1169-70:  Public Hearing Transcripts; AR 1171-1351:  Public Comments; and AR 1352-62: Comments received after 11/15/05.  AR 1363-86 are Research Literature.  The Supplemental Administrative Record is cited as SAR and corresponding Bates numbers begin with S (i.e., SAR 1, Bates S0001).

70 Fed. Reg. 6819 (Feb. 9, 2005).  On July 26, 2006, the Endangered Species Act ("ESA") 10(j)

classification was finalized for New Mexico and Arizona.  Endangered and Threatened Wildlife

and Plants; Establishment of a Nonessential Experimental Population of Northern Aplomado

Falcons in New Mexico and Arizona, 71 Fed. Reg. 42,298 (July 26, 2006).

> Congress added section 10(j) to the Endangered Species Act in 1982 to address the
> Fish and Wildlife Service's and other affected agencies' frustration over political
> opposition to reintroduction efforts perceived to conflict with human activity. . . .
> Congress hoped the provisions of section 10(j) would mitigate industry's fears
> experimental populations would halt development projects, and, with the
> clarification of the legal responsibilities incumbent with the experimental
> populations, actually encourage private parties to host such populations on their
> lands.

Wyoming Farm Bureau Federation v. Babbitt, 199 F.3d 1224, 1231-32 (10th Cir. 2000) (citing

H.R. Rep. No. 97-567, at 8 (1982); see also 16 U.S.C. § 1539(j).

Plaintiffs filed the instant Petition for Review of Agency Action on October 22, 2007.

(Doc. 46).  Within the instant Petition, Plaintiffs make, *inter alia*, the following claims:  claim

three alleges Defendant unlawfully withheld or unreasonably delayed action in violation of the

Administrative Procedure Act ("APA"); claim four alleges Defendant violated the ESA by

allowing the release of an experimental population of an endangered species where such a

release was not "outside the current range of such species"; claim five alleges Defendant

violated the ESA by allowing the release of an experimental population of an endangered species

where such a release was not "wholly separate geographically from non-experimental

populations of the same species"; claim seven alleges Defendant violated the National

Environmental Policy Act ("NEPA") by predetermining the results of its NEPA analysis before

going through the mandated NEPA process.

## II.  LEGAL ANALYSIS

The Court's review of the rules and record is governed by the APA, 5 U.S.C. § 706. Specifically, the Court must determine whether Defendant:  (1) acted within the scope of its authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion.  Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994).  An agency action is arbitrary or capricious if:  (1) the agency did not consider an important aspect of the issue; (2) the agency's explanation of its action is opposed to the evidence before it; (3) the agency based its action on factors not intended by Congress; (4) the agency's action is simply implausible to the extent that it cannot be ascribed to agency expertise.  Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999). During the course of its deferential review, this Court must review the entire administrative record, or the portions of the record cited by the parties.  Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1164 (10th Cir 2002).  Courts review agency action to eliminate decisions based on clear errors of judgment, but courts cannot substitute their own judgment for that of an agency.  Id.  Moreover, "[t]he substantial-evidence standard does not allow a court to displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *do novo*."  Trimmer v. United States, 174 F.3d 1098, 1102 (10th Cir. 1999) (citations omitted).

## A.  Claims Four and Five

Because claims four and five concern the Defendant's interpretation of the ESA and the agency's own regulations, the Court must apply a level of deference to the agency decision.  See Chevron, U.S.C., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984) (stating that an agency's reasonable interpretation of an ambiguous statutory provision is entitled to deference).  Section 10(j), 16 U.S.C. § 1539(j), provides:

4

(**1**) For purposes of this subsection, the term "experimental population" means any population (including any offspring arising solely therefrom) authorized by the Secretary for release under paragraph (2), but only when, and at such times as, the population is ***wholly separate geographically*** from nonexperimental populations of the same species.

(**2**)(**A**) The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species ***outside the current range of such species*** if the Secretary determines that such release will further the conservation of such species.

(**B**) Before authorizing the release of any population under subparagraph (A), the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species.

(**C**) For the purposes of this chapter, each member of an experimental population shall be treated as a threatened species; except that--

    . . . .

(**ii**) critical habitat shall not be designated under this chapter for any experimental population determined under subparagraph (B) to be not essential to the continued existence of a species.

(**3**) The Secretary, with respect to populations of endangered species or threatened species that the Secretary authorized, before October 13, 1982, for release in geographical areas separate from the other populations of such species, shall determine by regulation which of such populations are an experimental population for the purposes of this subsection and whether or not each is essential to the continued existence of an endangered species or a threatened species.

Id. (emphasis added). In Wyoming Farm Bureau, the Tenth Circuit commented on the goal of 10(j) classification:

> In other words, Congress purposely designed section 10(j) to provide the Secretary flexibility and discretion in managing the reintroduction of endangered species. By regulation, the Secretary can identify experimental populations, determine whether such populations are essential or nonessential, and, consistent with that determination, provide control mechanisms (*i.e.*, controlled takings) where the Act would not otherwise permit the exercise of such control measures against listed species.

199 F.3d at 1233. Plaintiffs argue that Defendant's classification of the entire state of New Mexico under section 10(j) is illegal because New Mexico is within the "current range" of the Falcon and because the experimental population of the Falcon is not "wholly separate geographically" from the nonexperimental population of Falcons spanning across northern

Mexico and southwestern New Mexico or from the population of Falcons released in western Texas.  (Doc. 46).

### 1.  Plaintiffs' Petition

Plaintiffs, in their Petition, cite to numerous Falcon sightings:  (Doc. 46) (citing AR 15, 16, 164, 188, 196, 259, 261, 291, 302, 303, 316, 331, 425, 491, 493, 503, 516, 517, 523, 524, 549, 588, 651, 685, 740, 755, 778, 784, 786, 787, 790, 793, 794, 796, 797, 801, 816, 818, 825, 826, 829, 834, 836, 859, 890, 897, 899, 904, 905, 917, 924, 926, 1075, 1076, 1078, & 1079). Next, Plaintiffs point to two maps that allegedly show "that Falcons are occasionally or annually sighted across much of southern New Mexico and that Falcons are year-round residents of a portion of southwestern New Mexico" and that "recent sightings of Falcons in New Mexico [can be pinpointed] throughout the southern portion of the State. . . ."  Id. (citing AR 1171 at Bates 12663, 12657; 11/15/2005 letter from Nicole J. Rosmarino, Conservation Director for Forest Guardian to Joy Nicholopoulos, State Administrator, NMESFO, USFWS (attaching multiple articles).  Plaintiffs note that "the lead authors of these two scientific articles [that include the above mentioned maps,] Ray Meyer and Kendal Young cooperated on a memo, also found in the Record, and concluded: 'the frequency of recent sightings of individuals and pairs in the southwestern part of the state strongly suggests the existence of a population [inside New Mexico]."  Id. (citing AR 140 at Bates 1222).  Plaintiffs also assert that "the most compelling evidence that the Falcons observed in New Mexico are part of a connected population of Falcons living primarily in Mexico is an account of a wild Falcon observed flying back and forth across the border with Mexico continually over the course of a single day."  Id. (citing AR 1171 at Bates 12772-74).  Finally, Plaintiffs argue that "the possibility of west Texas Falcons showing up in New Mexico and being documented as crossing the state line, motivated FWS to speed up

6

its 10(j) rule before this happened." Id. (citing AR 635 at Bates 6438) (noting handwritten notes of meeting between FWS and TPF stating "w Tx birds may drift over to NM.  Really need the 10(j) in NM.").

### 2.  Defendant's Response

Defendant, in its Response, argues that Plaintiffs' fourth and fifth claims are "functionally indistinguishable" and both without merit.  (Doc. 53).  Defendant notes that as "Plaintiffs repeatedly emphasize, . . . there have been sporadic sightings of individual Falcons within these two states, and one attempt and one successful breeding by a single pair at one location in New Mexico.  But the key issues are whether these individuals constitute a population or, alternatively, whether these individuals are currently part of a population based outside of these states that now ranges within either state."  Id.

Arguing that it reasonably answered these questions in the negative, Defendant cites numerous portions of the record for support.[3]  Defendant further contends that Wyoming

---

[3]  Defendant cites:  71 Fed. Reg. at 42300-01 ("We do not consider the New Mexico 2002 nesting pair and any offspring produced by the pair to be a population.  Biologically, the term 'population' is not normally applied to a single pair, and so the few birds sighted in New Mexico could be considered dispersers from the Chihuahuan population.  In addition, we have no authority to manage a population in a different country.  Therefore, the existence of a group in Mexico should not preclude conservation and management of falcons in the United States in order to achieve species recovery."); AR 150 at Bates 1247-48, 3/17/2003 email with attachment from Lyle Lewis, FWS to Aplomado Falcon Program Mail List (reporting the opinions of Tom Cade, Ph.D., Professor Emeritus, Cornell University, Grainger Hunt, Ph.D., Senior Scientist, The Peregrine Fund, and Ian Newton, Institute of Terrestrial Ecology that "at present, there is no current viable or self-sustaining population in New Mexico.  There are merely the seeds of a possible one."); AR 151 at Bates 1259, 3/18/2003 email from Mike Phillips, Turner Endangered Species Fund to Aplomado Falcon Program Mail List (representing that "whether or not a falcon population exists in New Mexico is equivocal, and cogent arguments can be made for either position.  If I'm correct, then one could reasonably embrace that argument which is believed to have the greatest likelihood of bringing about the greatest good."); AR 154 at Bates 1266, 3/20/2003 email from Steve Chambers to Lyle Lewis, FWS (representing that "we will be asserting that the scattered occurrences in southern NM are not sufficient to violate the 'wholly

Farm Bureau is directly on point in this case, and that the "only discernable difference is that

here the Service knew from extensive surveys that two of the individual dispersing Falcons have

mated (only once successfully), and that by 2006 their territory had been abandoned." (Doc. 53).

Defendant also states that it utilized the same "requirements for establishing a 'population' that

<hr/>

separate' requirement, drawing a parallel with the litigation on wolves in the northern Rockies");
AR Doc. 162 at Bates 1296-1301, 4/4/2003 email and attachment from Aimee Roberson, FWS
to the Aplomado Falcon Program Mail List (noting the Tom Cade, The Peregrine Fund,
Response to Young & Meyer's Review of Aplomado Falcon Population Definition); AR 166 at
Bates 1317, 4/17/2003 email from Mike Phillips, Turner Endangered Species Fund to Aimee
Roberson, FWS (forwarding email from Michael Bean, Chairman, Wildlife Program,
Environmental Defense which represents that the policy of the ESA is served by using 10(j)
status "in areas where a species may be only occasionally present or where it is present only in
extremely low numbers and reproducing either not at all or at such low frequency as to be
unlikely to become securely established[.]"); AR 529 at Bates 4477, 1/11/2006 email from Bill
Ostheimer, NRS/Wildlife Biologist, Bureau of Land Management ("BLM"), to Eric Hein, FWS
(discussing the possible definition of a Falcon population in the proposed rule); AR 549 at Bates
4579, 2/9/2006 email with attachment from Mike Howard, BLM to latierra@spinn.net and
Patricia Zenone, FWS (mapping Falcon sightings in New Mexico and Mexico); AR 1090 at
Bates 12341, 2/10/2003 letter from Dr. Timothy Male, Senior Scientist, Environmental Defense,
and Michael J. Bean, Senior Attorney, Environmental Defense, to Joy Nicholopoulos, Field
Supervisor, FWS (expressing support for Defendant's proposal to consider the designation of an
experimental population area in New Mexico and Arizona); AR 1092 at Bates 12347-48,
2/10/2003 letter from J. Peter Jenny, Vice President, TPF, to Field Supervisor, FWS (arguing
that "no viable or self-sustaining population currently exists in New Mexico or Arizona" and
strongly supporting "the designation of an 'Experimental Nonessential' Population, under
Section 10j of the Endangered Species Act" regarding the Falcon in New Mexico and Arizona);
AR 1125 at Bates 12478-81, 11/12/2005 letter from Brian Hanson, Acting Field Supervisor,
New Mexico Ecological Services Field Office to Grainger Hunt, Ph.D., Senior Scientist, the
Peregrine Fund (offering support for the proposed 10(j) approach regarding the Falcon in New
Mexico and Arizona); AR 1151 at Bates 12533-34, 4/8/2005 letter from Michael J. Bean,
Chairman, Wildlife Program, Environmental Defense, to Field Supervisor, New Mexico
Ecological Services Field Office ("NMESFO") (representing that Environmental Defense
"supports the proposed rule to establish an experimental population" of Falcons in New Mexico
and Arizona under 10(j) status); SAR 52 at Bates S000289-314, 9/22/2000 memorandum from
Mike Phillips, Turner Endangered Species Fund to TPF's Pete Jenny, Jeff Cilek, and Angel
Montoya (encouraging the use of 10(j) status for the Falcon in New Mexico and Arizona and
suggesting further research regarding previous use of 10(j)); SAR 53 at Bates S000315-16,
6/7/2000 letter from Michael Bean, Senior Attorney, Environmental Defense to Nancy Kaufman,
FWS (arguing in favor of the use of 10(j) concerning the Falcons New Mexico).

were set forth for the gray wolf 10(j) rule[.]"  Id.  Defendant notes that it considered Plaintiffs'

conclusions regarding "geographical separation" and "current range" and simply came to

different conclusions.  Id.  (citing AR 1171 at Bates 12656-71; 71 Fed. Reg. at 42306-07

(comment 17 and Response)).  Finally, Defendant points out that it is entitled to a level of

deference and contends that its choice was certainly not arbitrary and capricious under the APA.

### 3.  Defendant-Intervenor's Response

Defendant-Intervenor The Peregrine Fund ("TPF" or "Defendant-Intervenor"), in their

Response, argues that "Plaintiffs appear to conclude, without support from the record or in the

law, that several sightings of a Falcon are the equivalent of the existence of a population.

Plaintiffs speculate that the few sightings in New Mexico are part of or are contiguous to the

Falcon population in Mexico."  (Doc. 50).  Defendant-Intervenor contends that "increased

sightings are likely simply the result of increased awareness of the bird."  Id. (citing AR 140 at

Bates 1222, 2/25/2003 Review of Aplomado Falcon Population Definition prepared by TPF

(noting that "increased awareness likely contributed in part to the increase in falcon reports")).

Defendant-Intervenor also argues that breeding birds in Mexico are over 120 miles removed

from southern New Mexico.  Id.  (citing AR 722, Bates 7710).[4]  Commenting on the Meyer and

Young article referenced by Plaintiffs, Defendant-Intervenor contends that individuals not

associated with FWS should not determine whether a population exists; rather, "the Court must

examine the applicable regulations and FWS determinations."  Id. (citing United States v.

McKittrick, 142 F.3d 1170, 1175 (9th Cir. 1998)).

---

[4]  Defendant-Intervenor's citation is in error.  AR 722 begins on Bates 7711, 7/24/2006
email with attachment from Patricia Zenone, FWS to Tod Stevenson, FWS and Susan Jacobsen,
FWS (attaching the Northern Aplomado Falcon 10(j) Designation- Final Rule.doc).

Defendant-Intervenor cites the Final 10(j) Rule for the following propositions:  AR 722 at Bates 7717, (concluding that the 2002 nesting pair had not spawned a population by 2006); Id. at Bates 7718 (noting that from 2000 through 2005 the average number of sightings in New Mexico were 4.0); Id. at Bates 7719 ("[S]ignificant re-colonization of habitats in Arizona and New Mexico by naturally occurring birds in Chihuahua would likely take decades, if at all, because the reproductive rate of the falcons in Chihuahua has typically been low.").  Finally, Defendant-Intervenor concludes that "FWS used the same approach permitted by the Tenth Circuit in Wyoming Farm Bureau when it determined that a population of Falcons does not exist in the non-essential, experimental area of New Mexico."  (Doc. 50) (citing Doc. 722 at Bates 7723-24 ("The Act does not require the protection of individuals to the exclusion or detriment of overall species recovery, or otherwise limiting the Department of the Interior's flexibility and discretion to define and manage an experimental population pursuant to section 10(j) (Wyoming Farm Bureau Federation v. Babbitt, 199 F.3d 1224 (10th Cir. 2000)).").

### 4.  Plaintiffs' Replies

Plaintiffs filed Replies to both Defendant's Response and to Defendant-Intervenor's Response.  (Doc. 59, 60).  Plaintiffs, in their Replies, do "not contend a Falcon population satisfying FWS's definition exists solely in New Mexico.  Rather, [Plaintiffs' argue] that the Falcons in southern New Mexico are part of a larger Falcon population in northern Mexico that satisfies FWS's population definition."  (Doc. 60).  Plaintiffs also allege that FWS "removed ESA protections from the Falcons in southern New Mexico, including at least one pair of breeding Falcons, even though these Falcons are part of a larger population in Mexico."  Id.

Plaintiffs cite numerous portions of the administrative record to support their contention

10

that a continuous population of Falcons ranges from Mexico into southern New Mexico.[5]

Plaintiffs also argue that because of the alleged continuous population of Falcons across the New

Mexico and Mexico border the interpretations of <u>Wyoming Farm Bureau</u> given by Defendant

---

[5] Plaintiffs cite:  AR 125 at Bates 1150, 1/27/2003 email with attachment from Susan Jacobsen, FWS to Mary Klee, FWS (noting in the attachment that the "Service supports augmenting natural populations within the bird's historic range."); AR 153 at Bates 1264, 3/20/2003 email from Brian Locke, Ph.D., Fort Bliss to Lyle Lewis, FWS (noting that the population definition "will be confined to compliance with the 10(j) issue.  It really gets into the argument of minimum viable population and has to ignore Mexico birds.  There are a million ways this could be attacked no matter what the final population definition."); AR 953 at Bates 10673, 9/11/02 BLM Comments to the Draft Purpose and Need for the Aplomado Falcon Reintroduction 10(j) Rule ("We believe that the proposal takes a narrow view of the definition of a biological population.  The imposition of a 10(j) rule creates an artificial/geopolitical border across the northern end of the contiguous population of aplomado falcons that extends from Chihuahua into New Mexico.  The dispersers and extant nesting pairs in New Mexico are part of that population."); AR 1171 at Bates 12659-61, 11/15/2005 letter from Nicole Rosmarino, Ph.D., Conservation Director for Forest Guardians to Joy Nicholopoulos, State Administrator, NMESFO, FWS, Comments on 10J Proposal for Northern Aplomado Falcon in New Mexico and Arizona (arguing that the Falcons spotted in southern New Mexico represent the northern portion of a population of Falcons in Mexico); AR 1197 at Bates 12867-69, 11/14/2005 letter from Terrell H. Johnson to Susan MacMullin, Field Supervisor, NMESFO, FWS, Comments on Reintroduction of Aplomado Falcon (arguing that sightings of Falcons in New Mexico represent a contiguous population spanning from Mexico); AR 1206 at Bates 12893-94, 11/11/2005 letter from S.O. Williams III to Susan MacMullin, Field Supervisor, NMESFO, FWS, Comments to Proposed Establishment of a Nonessential Experimetnal Population of Northern Aplomado Falcons in Southern New Mexico and Arizona (arguing that some Falcons reside in southern New Mexico and that the area must be considered part of the Falcons current range); AR 1211 at Bates 12903-13, 11/10/2005 email and attachment from Kendal Young to Patricia Zenone, Wildlife Biologist, NMESFO, FWS (arguing that the population of Falcons in Mexico extes into southern New Mexico); AR 1221 at Bates 12937-41, 11/7/2005 letter from Raymond Meyer to field Supervisor, NMESFO, FWS (noting that some recent information tends to show an increased presence of the Falcon in New Mexico beginning in the 1990s and a population along the United States-Mexican border); AR 1370 at Bates 13589, J. Peter Jenny, The Peregrine Fund, 2002 Operations Report (noting the appearance of a wild juvenile Falcon, which may have come from Mexico, at a Texas Falcon release site); SAR 20 at Bates S00094, 10/3/2002 email from Carrie Chalcraft, FWS to Lyle Lewis, FWS, Comments on Bean's 10(j) proposed rule draft (commenting that the argument that "southern New Mexico [is] outside of the current range of the species may be more difficult to defend given that there are known birds just across the border in Mexico and that southern NM birds are likely part of this population.  Dispersal distance of aplomado falcons has been documented at over 200km.").

and Defendant-Intervenor are incorrect.  Plaintiffs argue that when developing the wolf rule,

"FWS recognized that it could not include a small number of wolves in northern Montana that

were part of a larger Canadian population in the experimental population designation and thus

excluded that area."  (Doc. 59) (citations omitted).

### 5.  Oral Argument

Plaintiffs, in their opening remarks, asserted that this case turns on the facts.  Again,

Plaintiffs relied heavily on the two maps cited in the instant Petition for the proposition that

portions of southern New Mexico are in the current range of the Falcon.  AR 1171 at Bates

12663, 12657.  Next, Plaintiffs cited and discussed a number of documents from the record

which they argue show that portions of New Mexico are within the current range of and not

wholly separate geographically from the Falcon.[6]

---

[6]  AR 27 at Bates 415, 4/17/2002 email from Carrie Chalcraft, FWS to Lyle Lewis, FWS
("Any service position that a population of falcons does not already exist in New Mexico is
tenuous at best."); AR 40 at Bates 459-61, 6/24/2002 letter from Nongame Bird Coordinator to
Assistant Regional Director ("Section 10(j) of the Endangered Species Act cannot apply to this
situation due to the geographic overlap between existing populations of falcons and the proposed
release of captive-bred birds.  The burgeoning population in the Chihuahuan desert would not
benefit from an experimental, non-essential designation, and could likely be negatively
impacted."); AR 149 at Bates 1245, 3/17/2003 email from Sandy Williams, New Mexico Game
and Fish Department ("NMDGF") to Aplomado Falcon Program Mail List ("It seems pretty
clear that the birds in southern NM and northern [Chihuahua] represent one interacting
population."); AR 1119 at Bates 12467, 3/28/2005 email from John Marzluff, Associate
Professor, Division of Ecosystem Sciences, University of Washington to Susan MacMullin,
Filed Supervisor, NMESFO, USFWS ("Given, the nonessential nature of this reintroduction, the
fact that this falcon has, at best, moderate recovery priority, and occupies a range that barely
includes the US, HOW DO YOU JUSTIFY THIS REINTRODUCTION PROPOSAL?"); AR
1120 at Bates 12469, 4/13/2005 email from Dr. Steven Beissinger, Professor of Conservation
Biology and Chair, Ecosystem Science Division, University of California to Susan MacMullin,
Field Supervisor, NMESFO, USFWS, et al. ("Based on my own observations of these birds,
Aplomado Falcons are widely distributed in the Neotropics and not threatened.  They are
apparently colonizing New Mexico and Arizona, on their own as part of a natural range
expansion.  This represents the northern edge of their range."); AR 1206 at Bates 12893,
11/11/2005 letter from S.O. Williams to Field Supervisor, NMESFO, USFWS (arguing that 10(j)

In response, Defendant's counsel opened its remarks by stating that the dispute did not

turn on the facts, and that before the hearing itself, Defendant's counsel was unaware of any

disputes among the parties on the facts and the parties agree that the Falcon has been extirpated

---

would be illegal "because it would not be apart from existing naturally-occurring falcons"); AR
1221 at Bates 12937-38, 11/7/2005 letter from Raymond Meyer to filed Supervisor, NMESFO,
USFWS ("None of the birds observed in southwestern New Mexico have had leg bands which
points to the existence of a population independent of those populations currently monitored in
central Chihuahua where leg banding is performed at all monitored nests. The status of the
Aplomado falcon in Chihuahua remains enough of an unknown that its role as a source for
additional colonizers in the U.S. can only be speculated on, contrary to statements made in the
PR and the EA."); AR 1171 at Bates 12656, 11/15/2005 letter from Nicole J. Rosmarino,
Conservation Director for Forest Guardians to Joy Nicholopoulos, State Administrator,
NMESFO, USFWS (attaching article by Raymond Meyer entitled Recent nesting and current
status of Aplomado Falcon (Falco femoralis) in New Mexico which states that during a 2000-
2004 formal surveys "We found one territory that remained occupied by Aplomado Falcons
from October 2000 through the project completion in 2004. This pair successfully fledged three
young in 2002, the first such nesting by naturally occurring Aplomado Falcons in the United
States in 50 years. We also observed at least eight other falcons, including a new pair in the
monitored territory and another pair nearby. . . . The existence of an occupied territory in
southern New Mexico, plus reports of additional pairs and individuals on both sides of the
international border, indicate the presence of a population in southern New Mexico and adjacent
northern Chihuahua."); Id. at 12661 (attaching article by Kendal E. Young, New Mexico States,
et al. Entitled Aplomado Falcon Abundance and Distribution in the Northern Chihuahuan Desert
of Mexico which states that "an Aplomado Falcon population exists in the northern Chihuahuan
Desert from north-central Chihuahua to southern New Mexico"); Id. at 12760 (attaching
3/21/2005 New Mexico Department of Game and Fish memo from Chuck Hayes to Tod
Stevenson and Bruce Thompson which states that "the aplomado falcons in southern New
Mexico represent the northern portion of an extant population of aplomado falcons in the
northern Chihuahuan desert."); AR 1197 at Bates 12868, 11/14/2005 email from Terrell H.
Johnson to Susan MacMullin, Field Supervisor, NMESFO, USFWS ("First and foremost, the
aplomado falcon population in question is undoubtedly a single Chihuahuan Desert population,
with a core habitat area in Mexico. . . . Aplomado falcons in the US have not spontaneously
generated themselves from the ether, but manifest the range of the Chihuahuan Desert
population."); SAR 5 at Bates S00024, 3/26/2002 email from Claretta Daniels, USFWS to Ruby
Capers, USFWS (attaching internal FWS 3/4/2002 memo regarding the Falcon which states "A
majority of documented falcons in New Mexico are near the United States/Mexico border and
are presumed to be part of a population of falcons that overlaps the international boundary. . . .
The Act requires that 10(j) populations be wholly separate from populations that do not share
this same status. Given the existing evidence of falcons in New Mexico and the likelihood of
additional falcons in areas not yet surveyed, the Service does not believe that requirement can be
met.").

from the U.S. for over 50 years.  Further, Defendant's counsel represented that in 2001 and

2002, the record reflects one instance each year of one pair of Falcons attempting to breed,

unsuccessfully in 2001 and successfully in 2002 with three fledglings, but not attempting since.

Defendant's counsel also pointed out that there are no factual disputes in the briefs, and that

given the undisputed facts in the briefs, FWS rationally concluded that New Mexico is outside

the current range of the Falcon and is wholly separate geographically from any population of

Falcons.  Defendant's counsel also argued that the FWS did not act arbitrarily or capriciously,

and that when there is more than one permissible alternative, an agency is entitled to select

among permissible alternatives.  In doing so in this case, Defendant's counsel parsed the

difference between a potential Falcon breeding range and a forging range, arguing that the FWS

rationally decided the later existed in New Mexico.  Finally, Defendant's counsel argued that

Wyoming Farm Bureau stands for the proposition that the phrases "outside the current range"

and "wholly separate geographically" are vague and ambiguous enough that Chevron deference

applies.

　　　　Defendant-Intervenor concurred with Defendant that claims four and five turn on the law

because the majority of facts are undisputed.  Defendant-Intervenor also argued that Wymoing

Farm Bureau controls and pointed out that the FWS specifically stated it was following

Wyoming Farm Bureau when they adopted the 10(j) rule.  AR 722 at Bates 7723-24.  Moreover,

Defendant-Intervenor pointed out that the independent peer review scientists and the New

Mexico Department of Game and Fish discuss population without actually defining the term.

Instead, Defendant-Intervenor contended that the definition as provided in 50 C.F.R. § 17.3 is

the definition the FWS must adhere to.  Defendant-Intervenor also noted that some of Plaintiffs'

statements at the hearing were not discussed in the written pleadings.  Namely, statements

concerning additional sightings of Falcon breeding, or attempting to breed.  In sum, Defendant-Intervenor asserted that FWS appropriately came to the conclusion that a population of Falcons did not exist in New Mexico, and that this conclusion is supported by the law as established in the C.F.R. and in Wyoming Farm Bureau.

Plaintiffs, in a brief rebuttal, stated that the great weight of scientific authority in the record points to New Mexico as inside the current range of the Falcon, and that FWS should not be allowed to simply pick from alternative views of science.  Further, in regards to whether a population of Falcons exists in New Mexico, Plaintiffs argued that one portion of the record clearly alleges that four Falcon breeding pairs were spotted from 2000 to 2004.  AR 1171 at Bates 12657.  Finally, Plaintiffs reiterated that southern New Mexico in the instant case should be viewed as identical to northern Montana in Wyoming Farm Bureau; namely, that a population from over the border spread into the United States and that this area was unsuitable for 10(j) classification.

### 6.  Discussion

Wyoming Farm Bureau controls the Court's analysis of claims four and five.  In that case, "[t]he proposed action alternative the Fish and Wildlife Service adopted called for the annual reintroduction of fifteen wolves in two nonessential experimental population areas-Yellowstone National Park and Central Idaho-beginning in 1994.  Section 10(j) of the Endangered Species Act, 15 U.S.C. § 1539(j), expressly authorizes the establishment of such nonessential populations."  199 F.3d at 1229.  "Recovery Plan and final rules prescribe the release of 90-150 wolves from Canada into designated areas of Yellowstone and central Idaho over a three- to five-year period . . . notwithstanding the Department's acknowledgment (1) a colony of naturally occurring wolves exists in Montana, which as the number of wolves

increases, eventually will recolonize area of Yellowstone and Idaho; and (2) lone wolves have been confirmed to exist in or near the designated experimental population areas in Yellowstone and Idaho." Id.

In Wyoming Farm Bureau, the Agencies did not challenge the notion that individual wolves could leave, and sometimes had left, Canada and Montana and entered the areas deemed experimental population areas in central Idaho and Yellowstone. Id. at 1233. The Plaintiffs argued that "this possibility establishes an overlap of wolf 'populations,' or the overlap of the experimental areas and the 'current range' of naturally occurring wolf populations in contravention of the requirement in section 10(j)(1) that experimental populations of an endangered species must be wholly separate geographically from non-experimental populations of the same species." Id. The Tenth Circuit noted that Congress did not address the precise terms at issue in the case; rather, Congress deliberately put an agency in the position of resolving this management and conservation issue. Id. at 1234 (citing McKittrick, 142 F.3d at 1174). Therefore, because each experimental population will have a unique set of managerial rules, the Tenth Circuit stated that it must "defer to the [Department of the Interior's] interpretation of the phrase 'wholly separate geographically from nonexperimental populations,' so long as its interpretation does not conflict with the plain language of the Endangered Species Act." Id. (citing Hoyl v. Babbitt, 129 F.3d 1377, 1385 (10th Cir. 1997).

The Department of the Interior generally defined "population" under 50 C.F.R. § 17.3 as "a group of fish or wildlife . . . in common spatial arrangement that interbreed when mature." In regards to wolf reintroduction regulations, the Department of the Interior refined this definition to mean "at least two breeding pairs of gray wolves that each successfully raise at least two young" yearly for two consecutive years. 59 Fed.Reg. at 60256. Using the general and

16

refined definitions, the Department of the Interior concluded that "'geographical seperation' is any area outside the area in which a particular *population* sustains itself." Wyoming Farm Bureau, 199 F.3d at 1234 (citation omitted).  Reviewing this interpretation, the Tenth Circuit noted:

> These definitions preclude the possibility of population overlap as a result of the presence of individual dispersing wolves-by definition lone dispersers do not constitute a population or even part of a population, since they are not in "common spatial arrangement" sufficient to interbreed with other members of a population. Moreover, since it is highly unlikely a lone wolf will encounter another solitary wolf of the opposite sex and reproduce for two years running, the populations left behind by the lone wolves do not expand simply because they travel away.   This interpretation of the "geographic separation" requirement of section 10(j) is consistent with the language and objectives of the Endangered Species Act as a whole.   Congress defined "species," as used throughout the act, to represent subspecies or "any distinct population segment" of an interbreeding species.   16 U.S.C. § 1532(16).  This reference to species *vis à vis* populations or population segments, as opposed to individual specimens, is repeated throughout the text of section 10(j), thus reflecting the paramount objective of the Endangered Species Act to conserve and recover species, not just individual animals.  See McKittrick, 142 F.3d at 1174 (citing H.R. Conf. Rep. No. 97-835 at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 1860, 2871)). . . .   Moreover, we find noting in the Endangered Species Act that precludes steps to conserve a species in order to protect isolated individuals.

Id. at 1234-35.  Having found that the Agencies involved did not release experimental wolves in areas "wholly separate geographically from nonexperimental populations", the Tenth Circuit went on to state that "Plaintiffs' argument the Agencies failed to release the Canadian wolves outside the 'current range' of naturally occurring wolves is similarly flawed since Plaintiffs rigidly define 'current range' as it is used in section 10(j) to be that territory occupied by an individual wolf."  Id. at 1236.  The Tenth Circuit noted that while "current range" is not statutorily defined, section 10(j)(2)(A) mandates that:

> 'experimental population' must be established 'outside the current range of such species.' 16 U.S.C. § 1539(j)(2)(A). . . . Congress defined 'species,' consistent with its broad conservation and recovery goals, to constitute distinct, interbreeding

> population segments or subspecies, not individual animals.  By definition, then, an individual animal does not a species, population or population segment make. therefore, the Department, exercising its discretion under Section 10(j), reasonably interpreted the phrase 'current range' to be the combined scope of territories defended by the breeding pairs of an identifiable wolf pack or population.

Id.  The Department of the Interior, at the time of the 10(j) classification, concluded that the experimental population area did not support reproducing pairs of wolves.  The Tenth Circuit noted that the Plaintiffs-Appellees and Cross-Appellants "patently disagree" with, and "cite evidence in the administrative record they believe supports their position", not the official conclusions concerning "the existence of naturally occurring wolf populations" in the experimental population area.  Id. at 1241.  Nonetheless, the Tenth Circuit held that "the mere presence of contradictory evidence does not invalidate the Agencies' actions or decisions.  See Trimmer, 174 F.3d at 1102.  The [Plaintiffs-Appellees and Cross-Appellants] fail to show a lack of substantial evidence in the administrative record to support the Agencies conclusions . . . ."  Id.

The FWS, in the Northern Aplomado Falcon 10(j) Designation Final Rule, stated:

> The term "experimental population" means any population, including any of their offspring, authorized by the Secretary for release, only when the population is wholly separate geographically from nonexperimental populations of the same species.  In the case of the falcon, (1) this subspecies has been known to disperse up to 150 kilometers, (2) it would be virtually impossible to preclude naturally occurring individuals falcons from intermingling with the experimental population, and (3) there has been only one pair that has reproduced one time within the NEP area.  Designation of a 10(j) NEP requires that the reintroduced animals be "wholly separate" from any existing populations.  We do not consider the pair of falcons that bred in 2002 in Luna County to constitute a population.  Therefore, the exclusion of the counties surrounding the 2002 pair from the 10(j) designation is not necessary.  . . .  The [ESA] does not require the protection of individuals to the exclusion of detriment of overall species recovery, or otherwise limiting the Department of the Interior's flexibility and discretion to define and manage an experimental population pursuant to section 10(j) . . . .  [The CFR] definitions [of population and experimental population] preclude the possibility of population overlap as a result of the presence of individual dispersing falcons, because by definition, lone

dispersers do not constitute a population or even part of a population, since they are not in "common spatial arrangement" sufficient to interbreed with other members of a population. Congress defined "species," consistent with its broad conservation and recovery goals, to constitute distinct, interbreeding population segments or subspecies, not individual animals. By definition then, an individual animal does not constitute a species, population, or population segment. In the case of the gray wolf, the Department of the Interior, exercising its discretion under section 10(j), reasonably interpreted the phrase "current range" to be the combined scope of territories defended by the breeding pairs of an identifiable wolf pack or population . . . . we have used the same approach for the falcon. Therefore, a population of falcons does not exist in the NEP area. Breeding falcons are not evenly distributed between the United States border and the Chihuahuan group of falcon pairs. There is a gap of approximately 222 km (138 mi) between the Luna County pair in New Mexico and the most northern, known Chihuahuan breeding pair in Mexico (Howard 2006c). The single pair of New Mexico falcons that successfully reproduced only once in 2002 (after a 50-year absence) is neither self-sustaining, a group, nor in common spatial relationship with the group of approximately 25 to 35 breeding falcon pairs in Mexico. These Mexico falcons occur 160 kilometers (KM) (100 miles (mi)) or more south of the Untied States border. They are clustered in common spatial relationships, are self-sustaining, and are interbreeding.

We do not consider the New Mexico 2002 nesting pair and any offspring produced by the pair to be a population. Biologically, the terms "population" is not normally applied to a single pair, and so the few birds sighted in New Mexico could be considered dispersers from the Chihuahuan population. In addition, we have no authority to manage a population in a different country.

AR 722 at Bates 7723-25.

In the instant Case, the Court must decide whether the FWS' interpretation of the "wholly separate geographically" and "outside the current range" provisions reflect the goals of the Endangered Species Act "to protect natural populations[.]" Rep. No. 97-567, 97th Cong., 2d Sess. at 33 (1982). It is undisputed that numerous Falcon sightings in New Mexico have occurred. In addition, there is no dispute that a pair of Falcons successfully bred in 2002 in Luna County. Plaintiffs, at their oral presentation, argued that four breeding pairs were spotted from 2000 to 2004. For this proposition Plaintiffs cite to AR 1171 at Bates 12657, which reports in pertinent part that between 2000 and 2004 there were 19 reported sightings of 24 birds, including 4 pairs and 3 fledglings in Bernalillo, Eddy, Grant, Hidalgo, Luna, and Otero counties.

19

Specifically, the report states:

> We found one territory that remained occupied by Aplomado Falcons from October 2000 through the project completion in 2004.  this pair successfully fledged three young in 2002, the first such nesting by naturally occurring Aplomado Falcons in the United States in 50 years.  We also observed at least eight other falcons, including a new pair in the monitored territory and another pair nearby.  Additionally during 2000-2004, we received credible reports of 11 falcons, including one pair, elsewhere in New Mexico, plus others just south of the United States--Mexico border.

AR 1171 at Bates 12656.  Plaintiffs, through their pleadings and oral arguments, contend that the record shows that the current 10(j) classification of the entirety of New Mexico violates the "outside the current range" and "wholly separate geographically" mandates.  Specifically, Plaintiffs argue that the Falcons spotted in southern New Mexico are part of a larger Falcon population in northern Mexico, and that this continuous swath of Falcon population deems 10(j) classification of southern New Mexico illegal.  Put another way, Plaintiffs claim the small population of wolves in northern Montana in Wyoming Farm Bureau are similar to the Falcons spotted in southern New Mexico.

Plaintiffs contentions are flawed for a number of reasons.  There was no debate in Wyoming Farm Bureau that the wolves in northern Montana met the definition of population provided by the CFR and refined by the agency itself.  Here, that is simply not the case.  Although Plaintiffs vehemently disagree with FWS' determination that a population of Falcons does not exist in New Mexico, they are unable to show a lack of substantial evidence in the administrative record to support FWS' conclusions.  See Trimmer, 174 F.3d at 1102.  The administrative record, pleadings and oral argument demonstrate a clear divide of opinions regarding this very issue.  However, the existence of contradictory evidence alone cannot invalidate FWS' actions or decisions.  See id.  Moreover, the parties positions conflict on exactly where breeding Falcons reside in Mexico, whether and how often they cross the border into New

Mexico, and whether such crossings are solely for the purpose of forging.  Notwithstanding these

issues, FWS has no control over Mexican territory, and the existence, or lack thereof, of a

population of Falcons in Mexico cannot change whether there is a population of Falcons in New

Mexico.

FWS generally defines "population" as "a group of fish or wildlife . . . in common spatial

arrangement that interbreed when mature."  50 C.F.R. § 17.3.  It did not refine this definition in

the context of the Falcon.  Under section 10(j), each experimental population has its own unique

set of rules; thus, the Court must defer to FWS' interpretation of the phrase "wholly separate

geographically from nonexperimental populations," as long as this interpretation does not

conflict with the plain language of the ESA.  I do not observe such a conflict in this case.  The

definition of population given in the Northern Aplomado Falcon 10(j) Designation Final Rule

precludes population overlap as a result of the presence of individual dispersing Falcons.  By

definition individual Falcons do not constitute a population or part of a population, because they

are not in "common spatial Arrangement" to the extent that they can interbreed with other

members of a population.  Unlike a lone wolf, a lone Falcon can cover significantly larger areas

due to its mastery of flight.  Although this raises the chances a lone Falcon will encounter

another lone Falcon in New Mexico, this alone does not necessarily raise the limited number of

Falcons spotted in New Mexico into the definition of population given in the final rule.

Researches recorded only one pair of Falcons who successfully bred in New Mexico in 2002,

despite the increased awareness and surveillance for such an occurrence.  This displays the high

unlikelihood of lone disperses successfully breeding in New Mexico.  Accordingly, the FWS'

interpretation of "wholly separate geographically" does not conflict with the plain language of

the ESA.

Similarly, Plaintiffs' argument that FWS released experimental Falcons within the "current range" of the naturally occurring Falcons is specious because, like the Plaintiffs in Forest Guardians v. Babbitt, 174 F.3d 1178, 1191 (10th Cir. 1998), Plaintiffs in this case define "current range" to be territory occupied by lone Falcons. Accordingly, FWS utilized its Congressionally granted discretion under section 10(j), reasonably interpreting the phrase "current range" in exactly the same manner as in Wyoming farm Bureau. For these reasons, Plaintiffs claims four and five must fail. Although it is conceivable that the FWS service could have reached a conclusion supported by Plaintiffs, second guessing the reasonable decisions of the FWS is not the job of this Court. Doing so would eliminate the discretion and flexibility that Congress intended the FWS to have on this subject. Accordingly, the Court hereby denies Plaintiffs' claims four and five.

## B. Claim Three

The Court, in a previous Memorandum Opinion and Order, found that Defendant's failure to respond to the Plaintiffs 2002 Petition is unreasonable agency delay, and under the binding precedent of Forest Guardians v. Babbitt, 174 F.3d 1178, 1191 (10th Cir. 1998), the Court ordered Defendant FWS to respond in regards to critical habitat designation in Texas. (Doc. 82). In that Memorandum Opinion and Order the Court also noted that "New Mexico and Arizona cannot be simultaneously designated under the current 10(j) classification and as critical habitat for the Falcon. If the Court upholds the current 10(j) classification, claim three of the instant Peition is moot in regards to New Mexico and Arizona. All parties acknowledged as much at the May 20, 2008 hearing." Id. Accordingly, because this Memorandum Opinion and Order upholds the 10(j) classification, Plaintffs' claim three is denied as moot in regards to New Mexico and Arizona.

**C.  Claim Seven**

NEPA requires federal agencies to analyze the environmental consequences of proposed agency action, alert the public to such impacts, and adequately elaborate on how their actions will address such impacts.  See Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, 462 U.S. 87 (1983).  NEPA's goal is to "focus[ ] the agency's attention on the environmental consequences of a proposed project," to "guarantee[ ] that the relevant information will be made available to the larger audience that may also play a role" in conceiving and applying the agency's decision, and to provide other government entities "adequate notice of the expected consequences and the opportunity to plan and implement corrective measures in a timely manner."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-50 (1989).  However, NEPA is a procedural requirement, it does not proscribe the end result of agency action.  Id. at 350.  The Tenth Circuit has noted that NEPA only mandates that an agency must take a "hard look" at environmental consequences before taking a major federal action. Citizens' Comm. To Save Our Canyons v. U.S. Forest Service, 297 F.3d 1012, 1022 (10th Cir. 2002).   "[O]nce environmental concerns are adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions."  Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1150 (10th Cir. 2004).

"Before an agency may take 'major Federal actions significantly affecting the quality of the human environment,' 42 U.S.C. § 4332(2)(C), an agency must prepare an environmental impact statement ('EIS') in which the agency considers the environmental impacts of the proposed action and evaluates 'alternatives to the proposed action,' id. at § 4332(2)(C)(iii), including the option of taking 'no action,' 40 C.F.R. § 1502.14(d)."  Silverton Snowmobile Club v. U.S. Forest Service, 433 F.3d 772, 780 (10th Cir. 2006).  "Agencies need not prepare a full

EIS . . . if they initially prepare the less detailed environmental assessment ('EA') and, based on

the EA, issue a finding of no significant impact ('FONSI'), concluding that the proposed action

will not significantly affect the environment."  Lee v. U.S. Air Force, 354 F.3d 1229, 1237 (10th

Cir. 2004) (citation and quotation marks omitted).  If an agency decides to issue a FONSI rather

than an EIS, this "is a factual determination which implicates agency expertise and accordingly,

is reviewed under the deferential arbitrary and capricious standard of review."  Comm. to

Preserve Boomer Lake Park v. Dep't of Transp., 4 F.3d 1543, 1555 (10th Cir. 1993).  In this

case, FWS issued an EA and a FONSI.  Plaintiffs argue that, in doing so, the Defendant violated

the APA and NEPA.  Specifically, Plaintiffs, in their Petition, argue that "FWS' NEPA analysis

is a fraud because the Agency pre-determined the results of its analysis in 2002 before the NEPA

process began."  (Doc. 46).

**1.  Plaintiffs' Petition**

Plaintiffs, in the instant Petition, cite numerous sections of the record for the proposition

that FWS predetermined the NEPA analysis as early as 2002.[7]

---

[7]  Plaintiffs cite:  AR 24 at Bates 407, 4/5/2002 email from Lyle Lewis, FWS to Mike
Phillips, Turner Endangered Species Fund (noting on 4/4/2002 that "everyone [has] jumped on
the 10(j) band wagon.  It appears a done deal.  No one will admit it publicly, but in private the
opinion is fairly universal in the Service-we'll spend 2-3 years on 10(j), get taken to court and
lose.  In 4-5 years, we'll be back to where we are today."); Id. at Bates 406 (noting on 4/5/2002
that there are potential legal problems with classifying New Mexico and Arizona under 10(j));
AR 52 at Bates 491-92, 7/19/2002 email with attachment from Joy Nicholopoulos, FWS to Lyle
Lewis, FWS and Carrie Chalcraft, FWS (noting in the attachment dated 7/22/2002 and entitled
Agenda:  Northern Aplomado Falcon 10j for New Mexico and Arizona that):

    1. **The 10j needs to be "clean":**
        a.  We need to define and clearly articulate a population definition (similar
        to wolf definition as defined by Michael Bean) which encompasses any
        and all Aplomado Falcons occurring within New Mexico and Arizona
        prior to the implementation of the 10j.

b.  We cannot carve out any sections of either state.

c.  Important that the 10j process <u>not</u> be contingent upon ongoing surveys which could describe additional individuals.  All existing falcons need to be part of the 10(j).

2. **Timing of the Process:**
a. The June 29 Meeting generated a time limit to accomplish the 10j that would run through August of 2004.  This 2-year time line needs to be shortened so that it conforms with the biology/recovery of the Aplomado Falcon.

b. This would not allow for release until 2005.

c. Concern that birds released in West Texas will begin showing up in NM prior to implementation of the 10j.

d. Will including Arizona in the 10j truly add an extra year? Will this require an EIS?

e. Ann Klee suggested that we pursue a 'Categorical Exclusion" under the NEPA process.

f.  Don't we really want to work this process in reverse?  We know what we want and there are no alternatives other than no action.

3. **Review of the Recovery Plan:**
a.  The Peregrine Fund thinks it best to hold off on any revision of the current Recovery Plan until after the 10j is implemented.

b.  Important that any review, if undertaken, not slow down the implementation of the 10j.

4. **DOD and BLM:**
a.  They appeared to be all over the map regarding the 10j at the June 28 meeting.

b.  They talked about carving out sections from the 10j and the need to manage habitats.

c.  There comments indicate that they don't understand the 10j.

5. **Initial Release Areas:**

25

In sum, Plaintiffs argue that:

> FWS did exactly what NEPA forbids.  It wrote the [10(j)] rule, or rather allowed
> The Peregrine Fund to write a rule for it, and reached its conclusion before its
> NEPA analysis began.  Cut out of the actual decision making process, Plaintiffs'
> were regulated to 'sham' public comment procedures of the FWS' predetermined
> NEPA analysis–an affair which stands NEPA on its head.

(Doc. 46).

### 2.  Defendant's Response

Defendant, in its Response, argues that Plaintiffs' claim of NEPA predetermination "is

defective . . . because rather than criticize the analysis contained in the Service's EA or [FONSI],

Plaintiff's rely solely on a handful of email and other documents generated years before the

Service issued its EA or FONSI."  (Doc. 53).   First, Defendant points out that Plaintiffs' Petition

does not attack the validity of the "EA's analysis of environmental effects or the Service's

---

        a. Away from existing sightings.
        b. None in Arizona.
        c. Separate process in 10j for release in DOD and BLM?
    6. **Public Opinion:**
        a. Does the Service want/need to engage potential opposition groups
        (SWCBD, Forest Guardians, etc)?  The Peregrine Fund prefers not to have
        these groups at the table, believing that they will not add anything and
        could slow the process down.

); AR 910 at Bates 9895, 1/22/02 Memorandum from Mike Turner, Endangered Species Fund to
TPF, FWS, Turner Endangered Species Fund and Environmental Defense (noting that TPF
"indicated that birds would not be released unless 10(j)-like assurances (i.e., elimination of
Section 7 consultation requirements) were provided to the BLM and DoD"); SAR 20 at Bates
S00086, 10/3/2002 email from Carrie Chalcraft, USFWS to Lyle Lewis, USFWS entitled
"comments on Bean's 10(j) proposed rule" (noting in a 9/30/2002 email from Chalcraft to Lewis
that "Here are my preliminary comments on the draft...by the way, I didn't realize that Bean was
writing up a draft for us.  It's a bit early for that isn't it?  Given that we haven't conducted any
scoping or done an NEPA yet?").

finding of no significant impact under NEPA." Id.  Defendant argues that the 2002 email of a

FWS biologist Lyle Lewis, AR 24 at Bates 406-07, does not verifiably prove predetermination

because it is a "pre-NEPA, offhand comment by a non-decision maker [that] is not the type of

evidence that will support a claim of predetermination." Id. (citing Nat'l Audbon Soc'y v. Dep't

of the Navy, 422 F.3d 174, 198 (4th Cir. 2005) ("NEPA of course prohibits agencies from

preparing an EIS simply to 'justify [ ] decisions already made.'  40 C.F.R. § 1502.2(g).  But the

evidence we look to in determining whether this has taken place consists of the environmental

analysis itself.  It does not include, as plaintiffs suggest, the alleged subjective intent of agency

personnel divined through selective quotations from email trails.") (citation omitted); see also

Earth Protector, Inc. v. Jacobs, 993 F.Supp. 701, 708 (D.Minn. 1998)).

Defendant also contends that even if this comment had been made by a decision maker, it

would not prove predetermination because a subjective opinion does not illustrate FWS'

motives.  Id. (citing Spiller v. White, 352 F.3d 235, 242 (5th Cir. 2004) ("Although it is true that

agencies are expected to engage in good faith fact-finding, when their findings are challenged as

arbitrary and capricious, the agencies' actions are judged in accordance with their stated reasons.

See, e.g., In re: Comptroller of the Currency, 156 F.3d 1279 (D.C. Cir.1998). Thus, the 'actual

subjective motivation of agency decision makers is immaterial as a matter of law-unless there is

a showing of bad faith or improper behavior.' Id. at 1279-80."); see also Hanon v. Clark, No. 02-

1348, 70 Fed. Appx. 519, 523 (10th Cir. 2003); Manygoats v. Kleppe, 558 F.2d 556, 560 (10th

Cir. 1977); Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000)).

Responding to Plaintiffs' arguments concerning specific portions of the record (AR 52 at

Bates 491-92; AR 910 at Bates 9895; SAR 20 at Bates S00086), Defendant contends that these

isolated portions of the record cannot show prejudgment and that "these remaining emails

concern documents prepared by the Peregrine Fund, an outside third-party, rather than by the

Services."[8] (Doc. 53) (citing <u>Nat'l Audubo Soc'y</u>, 422 F.3d at 198; <u>Ass'n of Public Agency</u>

<u>Customers v. Bonneville Power Admin.</u>, 126 F.3d 1158, 1185 (9th Cir. 1997) ("[A]n agency can

formulate a proposal or even identify a preferred course of action before completing an EIS.").

Defendant also cites <u>Sierra Club v. Lujan</u>, 949 F.2d 362, 369-70 (10th Cir. 1991) for the

proposition that third-party "external pressures are common place in EA and EIS preparation."

Finally, Defendant argues that they "considered options that did not include non-essential

experimental designation (Alternatives A, D and E), and which considered that designation for

less than all of New Mexico (Alternative C)." (Doc. 53) (citing AR 688 at Bates 7466, 7/6/2006

email from Mary Klee, FWS to Kurt Johnson, FWS, Susan Jacobsen, FWS, Sarah Quamme,

FWS, Patricia Zenone, FWS, Michelle Morgan, FWS (citing to the Final Environmental

Assessment and noting the alternatives other than 10(j) classification that FWS considered).

### 3.  Defendant-Intervenor's Response

Defendant-Intervenor, in its Response, initially argues that an agency is allowed to draft a

proposal or acknowledge a preference prior to finalizing an EIS.  (Doc. 50) (citing <u>Bonneville</u>

<u>Power Admin.</u>, 126 F.3d at 1185).  Defendant-Intervenor states that "the record submissions of

the affected agencies and other third parties were *uniformly* supportive of the preferred action

alternative, the 10(j) rule issued by the FWS." (Doc. 50).[9]  TPF cites <u>Native Ecosystems Council</u>

---

[8]  AR 910 at Bates 9895 was not authored by the TPF, nor is it an email; rather, it is a
memorandum by Mike Phillips, Director of the Turner Endangered Species Fund.

[9]  Defendant-Intervenor cites:  AR 3 at Bates 41, 6/8/1990 USFWS Northern Aplomado
Falcon Recovery Plan; AR 17 at Bates 393-394, 3/13/2002 letter from Duane Shroufe, Arizona
Game and Fish Department Director to Pete Jenny, TPF; AR 1225 at Bates 12946, 11/1/2005
letter from Duane Shroufe, Arizona Game and Fish Department Director to Susan MacMullin,
Field Supervisor, NMESFO, USFWS; AR 1176 at Bates 12815, 11/15/2005 fax from Bruce C.

v. United States Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005) (citations omitted), for the

proposition that if "'all reasonable alternatives' have been considered an appropriate explanation

is provided as to why an alternative was eliminated, the regulatory requirement is satisfied."

Defendant-Intervenor points out that no evidence of decision maker predetermination has been

cited.  Defendant-Intervenor also points out that FWS biologist Lyle Lewis, who seemed to

suggest 10(j) classification was a "done deal", AR 24 at Bates 407, also acknowledged a range of

Thompson, Director, NM Department of Game and Fish to Susan MacMullin, Field Supervisor,
NMESFO, USFWS; AR 1133 at Bates 12498, 3/8/2005 letter from Donald Gentry, Department
of the Army to Susan MacMullin, Field Supervisor, NMESFO, USFWS; AR 1137 at Bates
12506, 3/17/2005 email from Dr. Bert Bivings, environmental Program Leader, Headquarters,
US Army Forces Command to R2FWE_AL@fws.gov; AR 1153 at Bates 12539, 4/11/2005 letter
from Donald Delorenzo, USDA FS to Susan MacMullin, Field Supervisor, NMESFO, USFWS;
AR 1213 at Bates 12917-19, 11/9/2005 email from Paul Sawyer, NM State Land Office, BLM to
Field Supervisor, NMESFO, USFWS; AR 1217 at Bates 12926-28, 11/8/2005 letter from
William Merhege, Deputy State Director, BLM to Field supervisor, NMESFO, USFWS; AR
1227 at Bates 12950 10/28/2005 letter from I. Miley Gonzalea, Ph.D., NMSU, NM Department
of Agriculture to Susan MacMullin, Field Supervisor, NMESFO, USFWS; AR 1247 at Bates
12985, 10/20/2005 letter from Patrick H. Lyons, State of NM, Commissioner of Public Lands to
Suisan MacMullin, Field Supervisor, NMESFO, USFWS; AR 1226 at Bates 12949, 10/28/2007
letter from Mark Winkleman, Arizona State Land Department to Susan MacMullin, Field
Supervisor, NMESFO, USFWS; AR 1157 at Bates 12546, 4/11/2005 email from Mike Phillips,
turner Endangered Species Fund to R2FWE@fws.gov; AR 1186 at Bates 12840, 11/15/2005
email from Don L. (Bebo) Lee, President, NM Cattle Grower's Association to Susan MacMullin,
Field Supervisor, NMESFO, USFWS; AR 1187 at Bates 12843, 11/15/2005 email from Mike
Corn, President, NM Wool Growers, Inc. to Susan MacMullin, Field Supervisor, NMESFO,
USFWS; AR 1188 at Bates 12845, 11/15/2005 email from Mike G. Casabonne, President, NM
Federal Lands Council to Susan MacMullin, Field Supervisor, NMESFO, USFWS; AR 1228 at
Bates 12951, 10/27/2005 letter from C.B. Lane, Arizona Cattle Growers' Association to susan
MacMullin, Field supervisor, NMESFO, USFWS; AR 1093 at Bates 12338-39, 2/10/2003 fax
from Dr. Timothy Male Senior Scientist and Michael J. Bean, Senior Attorney to Joy
Nicholopoulos, FWS; AR 1151 at Bates 12533, 4/8/2005 letter from Ichael Bean, Environmental
Defense to Field Supervisor, NMESFO, USFWS; AR 1360 at Bates 13214-15, 11/16/2005 email
from Michael J. Bean, Environmental Defense to USFWS; AR 1092 at Bates 12347, 2/10/2003
letter from J. Penny, Vice-President, The Peregrine Fund to USFWS; AR 1165 at Bates 12561,
4/11/2005 letter from J. Peter Jenny, The Peregrine Fund to Field supervisor, NMESFO,
USFWS; AR 1199 at Bates 12873, 11/14/2005 letter from J. Peter Jenny, Vice President, The
Peregrine Fund to Field Supervisor, NMESFO, USFWS; SAR 7 at Bates S00030, 4/9/2002 letter
from William Burnham, The Peregrine Fund to Steve Williams, USFWS.

alternatives were available only four days later.  (Doc. 50) (citing AR 50 at Bates 485, 7/9/2002 email from Brian Locke, Fort Bliss, US Army to Lyle Lewis, FWS and Carrie Chalcraft, FWS (noting in a 7/9/2002 email from Lewis to Locke that "The critical analysis will be whether 10(j) is the best vehicle for recovery of the species [and how much and where].  Recovery is in everyone's best interest so an analysis of a range of alternatives should come up with which would best recover the falcon.")).  Moreover, Defendant-Intervenor contends that whether a FWS biologist believes 10(j) classification is illegal is not controlling; rather, whether Defendant's lawyers and the courts do is.  In Response to Plaintiffs' citation of the 7/22/2002 TPF Agenda, AR 52 at Bates 491-92, Defendant-Intervenor notes that the Agenda was written for discussion purposes only, that other parts of the record show that TPF merely requested 10(j) classification,[10] and that nothing in the agenda shows that any FWS decision makers had already made a final decision.[11]  Finally, Defendant-Intervenor argues that having Environmental Defense's Michael Bean draft the proposed 10(j) rule was neither inappropriate, nor evidence of NEPA predetermination.

### 4.  Plaintiffs' Replies

Plaintiff, in their Replies, initially argue that even if the quality of FWS' NEPA analysis is not in question, the Court should not dismiss Plaintiffs' valid predetermination assertion.

---

[10]  SAR 7 at Bates S00030, 4/9/2002 letter from William Burnham, President, TPF to Steve Williams, Director, USFWS (following up on TPF's "proposal" regarding 10(j) classification and noting that Michael Bean of Environmental Defense "offered his advice and assistance in the development of the proposal presented to you").

[11]  AR 722 at Bates 7795, 7/24/2006 email with attachment from Patricia Zenone, FWS to Tod Stevenson, FWS and Susan Jacobsen, FWS (attaching the final rule for the 10(j) designation and showing Acting Assistant Secretary for Fish and Wildlife and Parks Matt Hogan signed, and thus made a final decision regarding the final rule, on July 7, 2006).

(Doc. 59, 60) (citing <u>Davis v. Mineta</u>, 302 F.3d 1104, 1113 (10th Cir. 2002); <u>Int'l Snowmobile</u>

<u>Mfrs. Ass'n v. Norton</u>, 340 F.Supp.2d 1249, 1259-61 (D. Wyo. 2004)).  Next, Plaintiffs set out

to prove two assertions:  that top-level decision-makers predetermined the outcome of the NEPA

process,[12] and that the facts in the instant case are similarly egregious when compared to the

facts of previous cases in the Tenth Circuit where NEPA predetermination was found to have

occurred.

　　　　Plaintiffs assert that the portions of the record they cited in their Petition should not be

cavalierly overlooked as the opinion of lower level employees.  Rather, Plaintiffs argue that

these documents "show what these biologists believed they were being instructed to do by their

superiors" and "establish that FWS 'decision-makers' had predetermined the results of the

NEPA process--by instructing their subordinates how to proceed."  (Doc. 60).  Next, Plaintiffs

argue that there is an abundance of "evidence of pressure from high level decision-makers to

predetermine the outcome of the NEPA process."  (Doc. 59, 60).[13]

_____

　　　　[12]  In making this argument Plaintiffs cite to Stephanie Paige Ogburn, <u>Bred for success</u>,
HIGHCOUNTRYNEWS.ORG, Nov. 13, 2006 (Doc. 46-2).  In a previous Memorandum Opinion and
Order (Doc. 79), I had withheld judgment on whether to let this article into evidence.  At the
May 20, 2008 oral arguments Plaintiffs offered to withdrawal the article; thus, the Court hereby
strike the article from the record and will not consider its contents in the instant Memorandum
Opinion and Order.

　　　　[13]  Plaintiffs cite:  AR 5, Bates 101, 2002 Draft of Proposed Rule including RO Staff
Comments (commenting on the proposed rule); AR 71, Bates 761, 10/2/2002 email with
attachment from Pete Jenny to Joy Nicholopoulos, FWS (noting that Directors of FWS' Regional
Office, State of New Mexico and State of Arizona "desire that this 10(j) to be clean,
straightforward, understandable, and no areas 'carved out' from the proposed NEP."); AR 206,
Bates 1725, 8/18/2003 email with attachment from Brian Locke, Fort Bliss to Mike Howard
BLM (noting that the 10j area is to remain the entire states of New Mexico and Arizona), AR
297, Bates 2738, 7/26/2004 email string from Robert Magill, Arizona Game and Fish
Department (AZDGF) to Lyle Lewis, FWS (discussing the time line for proposing and defending
the 10(j) status in New Mexico and Arizona); AR 373, Bates 3365, 2/3/2005 email with
attachment from Elizabeth Slown, FWS to Susan Jacobsen, FWS, Joy Nicholopoulos, FWS,

In addition, Plaintiffs argue "that the Regional director of FWS's Southwest Region, Dale

Hall (now Director of all of FWS) who was directly responsible for the 10(j) Rule and

accompanying NEPA analysis was 'adamant that the 10(j) cover NM and AZ'" and that "as

early as October 2003, representatives of TPF stated 'What Pete and I heard Dale Hall promise

was a clean 10(j).'"  (Doc. 60) (citing AR 170 at Bates 1371, 4/25/2003 email with attachment

from Joy Nicholopoulos, FWS to Aimee Roberson, FWS; AR 215 at Bates 1848, 10/15/2003

email from Thetis Gamberg, FWS to Bill Ostheimer, FWS).  Plaintiffs also contend that "many

individuals within the agencies involved felt compelled to point out the predetermined nature of

the NEPA process or recommended editing the Environmental Assessment to make it *seem* less

---

Lyle Lewis, FWS, Nancy Baczek, FWS, and Patricia Zenone, FWS (noting that TPF had a
meeting with Senate Committee on Energy and Natural Resources member Domenici to discuss
the Aplomado Falcon 10(j) rule); AR 530, Bates 4478, 1/11/2006 email from Sarah Quamme,
FWS to Susan Jacobsen, FWS (noting that "finalizing this rule is a priority for the Region and/or
Dale"); AR 541, Bates 4553, 1/31/2006 email from Sarah Quamme, FWS to Stephen Robertson,
FWS and Steve Chambers, FWS (noting that "Dale has made it a priority to finalize the rule this
spring" and that "we will need some advice and help finalizing the EA"); AR 966, Bates 10800,
7/9/2003 email with attachment from Pete Jenny, TPF to Bill Ostheimer, USFWS (attaching a
Draft Aplomado EA with comments from TPF); AR 968, Bates 10845, 7/11/2003 Draft from
TPF (recording TPF's comments on the Draft EA for Aplomado falcon reestablishment); AR
1005, Bates 11464, 10/15/2003 email with attachment from Angel Montoya, TPF to Bill
Ostheimer, USFWS (noting TPF comments on the proposed EA); SAR 17, Bates S00078,
6/25/2002 email from Angel Montoya, TPF to Carrie Chalcraft, USFWS (suggesting changes to
an agenda regarding a June 28, 2002 meeting concerning Northern Aplomado Falcon Release in
New Mexico); SAR 18, Bates S00081, 7/21/2002 email from Lyle Lewis, USFWS to Joy
Nicholopoulos, USFWS (commenting on an agenda regarding a July 22, 2002 meeting
concerning the Northern Aplomado Falcon 10j for New Mexico and Arizona); SAR 23, Bates
S000120, cover letter from Peter Jenny, TPF to Joy Nicholopoulos, USFWS (attaching a re-
drafted version of the Aplomado Falcon 10(j) Purpose and Need section and noting that the
Directors of FWS' Regional Office, State of New Mexico and State of Arizona all represented at
the July 22, 2002 meeting that they "desire that this 10(j) to be clean, straightforward,
understandable, and with no area 'carved out' from the proposed NEP").

predetermined." (Doc. 60).[14]

     Plaintiffs assert that the facts surrounding the instant case are easily flagrant enough to

merit the Court finding that the NEPA process was predetermined.  Specifically, Plaintiffs assert

that the record shows that "FWS provided approximately $150,000 to TPF to carry out the

---

     [14] Plaintiffs cite:  AR 34, Bates 426, 5/20/2002 email from Carrie Chalcraft to Mike
Phillips, Turner Endangered Species Fund (noting the time line on which the 10(j) and NEPA
processes take place); AR 56, Bates 659, 9/5/2002 email with attachment from Tracey Mader,
Turner Endangered Species Fund to Lyle Lewis, FWS (commenting on TPF Draft Purpose and
Need Statement); AR 69, Bates 724, 9/30/2002 email with attachment from Carrie Chalcraft,
FWS to Lyle Lewis, FWS (commenting on Michael Bean's proposed 10(j) rule and noting that
"I didn't realize that Bean was writing up a draft for us.  It's a bit early for that isn't it?  Given
that we haven't conducted any scoping or done an[y] NEPA yet??"); AR 75, Bates 801,
10/15/2002 email with attachment Sarah Rinkevich, FWS to Steve Heifert, FWS and Susan
Jacobsen, FWS (noting that the initial draft of the 10(j) was preliminary and that a draft should
not be finalized until scoping meetings have occurred and a draft EA has been put out); AR 78,
Bates 807, 10/18/2002 email from Susan Jacobsen, FWS to Sarah Rinkevich, FWS (noting that a
draft of a news release announcing the FWS is considering introducing Falcons in New Mexico
looks good, but that there may be concerns that this gives the impression that the FWS has
already decided); AR 83, Bates 819, 11/4/2002 email from Susan MacMullin, FWS to Susan
Jacobsen, FWS (noting that the FWS should proceed so that it does not appear they are making
up there minds before allowing the general public to comment on the proposal); AR 202, Bates
1609, 8/1/2003 email with attachment from Paul Sawyer, BLM to Lyle Lewis, FWS
(commenting on the first draft of the EA); AR 241, Bates 2235, 12/12/2003 email with
attachment from Paul Sawyer, BLM to Joy Nicholopoulos, FWS (commenting on the Nov. 17,
2003 draft of the EA); AR 953, Bates 10673, 9/11/2002 Comments by BLM (commenting on the
Draft Purpose and Need for the Aplomado Falcon Reintroduction 10j Rule); AR 957, Bates
10700, 4/28/2003 email from Brian Locke, Ph.D., Director of Environment, Department of the
Army to Aplomado Falcon Program Mail List (commenting on the Purpose and Need and
Population Definition);  AR 1010, Bates 11554, 10/21/2003 Comments by Mike Howard
(commenting on the 2nd Draft 10j EA); AR 1031, Bates 11907, 12/15/2003 email from Mike
Howard, BLM to Bill Ostheimer, USFWS (commenting on the Draft Aplomado Falcon
Reestablishment EA); SAR 20, Bates S00086, 10/3/2002 email from Carrie Chalcraft, USFWS
to Lyle Lewis, USFWS (commenting on Bean's 10(j) proposed rule draft); SAR 21, Bates
S000107, 3/28/2003 email from Carrie Chalcraft, USFWS to Bill Ostheimer, FWS and Aimee
Roberson, FWS (commenting on Draft Establishment of a Nonessential Exp. Pop. Purpose &
Need); SAR 60, Bates S000333, 4/28/2003 email from Brian Locke, Fort Bliss to Aplomado
Falcon Program mail list (commenting on Purpose and Need Population Definition).

Falcon release months before FWS completed its NEPA process." (Doc. 60)[15]  In comparing the

Peregrine Fund grant[16] to Davis, Plaintiffs state:

> This is overwhelming evidence of predetermination.  FWS bought the 10(j) Falcon
> release before it finished NEPA.  This is entirely analogous, and even more extreme,
> [than] the situation in Davis v. Mineta, where the agency was found to have
> predetermined its NEPA analysis because it had contractually obligated itself to a
> course of action before completing its NEPA process. 302 F.3d 1104, 1112-13 (10th
> Cir. 2002).  this case is exactly like Davis.  This Court should not hesitate to reach
> the same conclusion as the Tenth Circuit did there and hold FWS illegally
> predetermined the results of its NEPA analysis.

(Doc. 60).

### 5.  Oral Argument

Plaintiffs, in their opening statement, contend that there was a dramatic switch of opinion

---

[15]  Plaintiffs cite:  AR 598 at Bates 5665, 3/15/2006 email from Susan Jacobsen, FWS to
Chris Botnick, FWS (noting that "The Peregrine Fund is funded at $550,000 in fiscal year 2006,
which includes $150,000 for Northern aplomado falcon recovery activities" and also noting that
recovery acitivites are ongoing so it cannot be expressed that this money if for a one-time
reintroduction in New Mexico); AR 647, Bates 6840, 5/30/2006 email from Martha BalisLarsen,
FWS to Wendy Brown, FWS, Chris Botnick, FWS, Patricia Zenone, FWS, Susan Jacobsen,
FWS (discussing the earmark for the Peregrine Fund); AR 650 at Bates 6846, 5/30/2006 email
from Susan Jacobsen, FWS to Matha BalisLarsen, FWS, Chris Botnik, FWS, Patricia Zenone,
FWS, Wendy Brown, FWS and Laverna Chavez, FWS (noting the earmark for the Peregrine
Fund); AR 655, Bates 6863, 5/31/2006 email from Martha BalisLarsen, FWS to Patrick Joos,
FWS, Don Morgan, FWS, Paula Frechen, FWS, Susan Jacobsen, FWS, et. al. (discussing the
earmark for the Peregrine Fund); AR 703, Bates 7531, 7/12/2006 email from Elizabeth Slown,
FWS to Steve Spangle, FWS, Larry Bell, FWS, Wally Murphy, FWS, Susan Jacobsen, FWS
(noting the earmark for the Peregrine Fund);AR 725 at Bates 7821, 7/27/2006 email from Susan
Jacobsen, FWS to Mike McCollum, FWS (noting the earmark for the Peregrine Fund).

[16]  (Doc. 68-5 at 3-14).  Doc.  68-5 is Cooperative Grant Agreement No. 1448-20181-06
between USFWS and TPF.  The Grant Agreement is not part of the administrative record.
Defendant attached this agreement to a proposed Sur-Reply (Doc. 68-4).  The Court filed a
Memorandum Opinion and Order denying Defendant's Motion for Leave to File Sur-Reply.
(Doc. 80).  Although the Court denied the Motion for Leave to File Sur-Reply, I will hereby take
judicial notice of the Cooperative Grant Agreement (Doc. 68-5 at 3-14) because it is at the center
of the NEPA predetermination debate, there is no debate surrounding its authenticity, and parties
to this litigation have cited the document in their arguments.

within the FWS that starkly demonstrates predetermination.  (citing AR 24 at Bates 407; AR 52 at Bates 491-92).  Effectively, Plaintiffs argued that TPF ran the whole process, that they instructed the FWS service to decide on a 10(j) classification for New Mexico and Arizona before a NEPA analysis was done, and that the FWS ceded to every whim of TPF.  In arguing that TPF improperly steered the decision making, Plaintiffs counsel pointed to:  Michael Bean drafting the 10(j) rule; FWS' employees response to Bean's draft (citing AR 69, Bates 724); TPF directing the Turner Fund that the 10(j) must remain the entire states of New Mexico and Arizona (citing AR 206 at Bates 1732); email from Bill Ostheimer, FWS, to FWS adding a FONSI before the NEPA process was complete (citing AR 228 at Bates 2046); efforts by reviewers of the EA to make the document seem less predetermined (citing AR 241 at Bates 2237, 2239, 2234; AR 1010 at Bates 11554; SAR 21 at S000109); the TPF's own actions to steer the process towards 10(j) (citing SAR 23 at Bates S000120).  In addition, Plaintiffs argued that TPF was paid to conduct the release of Falcons in New Mexico before the 10(j) rule was adopted and before the NEPA process took place.  Plaintiffs contend that although the earmark was not necessary allotted to only Falcon release in New Mexico, the Court should read between the lines and realize that this was exactly Senator Domenici's purpose.  Specifically, Plaintiffs point to the internal FWS email discussing the anticipated use of the earmark.  (citing AR 598, Bates 5665).

Defendant responded by arguing that NEPA is a procedural requirement, that allows an agency to have a preferred alternative before or during the NEPA process, although not a predetermined one.  Defendant asserted that the NEPA process is owed a presumption of regularity and good fath, and that political pressure is a normal part of the NEPA process.  Reviewing the relevant Tenth Circuit precedent, Defendant contends that <u>Davis</u> stands for the

proposition that being contractually obligated to a certain position before the NEPA process is complete is evidence of predetermination, and that <u>Norton</u> stands for the proposition that if an agency decision-maker makes a public, albeit informal, speech announcing the direction of the agency before the official NEPA decision is formally published, that is evidence of predetermination.  In the instant case, Defendant argues, internal emails show vigorous debate amongst the many actors, not predetermination.

Bolstering Defendant's oral argument, TPF stated that it is a third party, not the decision-makers in this matter, but simply a concerned citizens group who vigorously requested the 10(j) rule be implemented in New Mexico and Arizona.  Defendant-Intervenor also noted that Michael Bean, the author of the draft 10(j) rule, does not work for TPF, he is not under contract with TPF or otherwise obligated to the TPF in any manner.  Defendant-Intervenor stated that it was perfectly logical to have a draft 10(j) before the NEPA analysis was complete because the FWS had a preferred alternative, they wanted to explore this alternative with the public at the scoping meeting, and no vehicle to exhibit this alternative would be as effective as the draft 10(j) rule itself.  Defendant-Intervenor also asserted that there is absolutely no evidence that the final decision maker in this case, acting Assistant Secretary for Fish and Wildlife and Parks Matt Hogan, predetermined his decision to proceed with the 10(j) classification.  Defendant-Intervenor also argues that there is no contractual obligation comparable to <u>Davis</u>, nor is there absolute condemnation of an alternative approach before the NEPA analysis was complete such as in <u>Norton</u>.  Finally, Defendant-Intervenor, pointed out that the earmark itself states that alternatives other than the 10(j) classification were being considered and outlines alternatives for the money if the 10(j) classification is not finalized.  (Doc. 68-5 at 4).

Plaintiffs, in their rebuttal, began by pointing out that the earmark had an item which

reads:  "The Peregrine Fund shall: . . . 3.  Contact landowners in New Mexico with regard to the

potential establishment of an experimental non-essential 10(j) population."  Id.  Plaintiffs argue

that this provision demonstrates that at least some of the money was dedicated to the 10(j) rule

before the rule was actually finalized.  Plaintiffs also point out that the FWS was also internally

discussing the use of the money for infrastructure.  (AR 725, Bates 7821).  Plaintiffs admitted

that there is no explicit contractual obligation in the instant case, but argue that the grant is very

close to such a situation.  Further, Plaintiffs acknowledge that Michael Bean was not paid by

TPF to draft the rule 10(j), but argue that is a distinction without a difference in relation to Davis

v. Mineta because the FWS deferred all their judgment to an outside entity.  Finally, Plaintiffs

contend that Matt Hogan's decision making was simply a rubber stamp, that FWS Regional

Director Dale Hall and TPF President Peter Jenny were actually pulling the strings, and that

there is amply evidence in the record of the latter predetermining the 10(j) rule status.

### 6.  Discussion

Plaintiffs, while asserting that Defendant predetermined NEPA, explicitly point the Court

to Davis and Norton.  In Davis, the Tenth Circuit concluded that an agency prejudged a NEPA

analysis.  302 F.3d at 1112.  In coming to this conclusion, the Tenth Circuit found that "an

agency's decision to issue a FONSI rather than prepare an EIS was arbitrary because the agency

had obligated itself contractually to issue a FONSI before it conducted an EA, making it clear

that the agency had 'prejudged the NEPA issues.'"  Lee, 354 F.3d at 1240 (citing and quoting

302 F.3d at 1112).  In Norton, the United States District Court for the District of Wyoming found

that the National Park Service ("NPS") made a prejudged political decision to ban snowmobiles

in Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr.

Memorial Parkway ("Parks").  340 F.Supp.2d at 1261.  "[O]n April 27, 2000,  [Assistant

Secretary for Fish and Wildlife and Parks Donald Barry] held a press conference in which he

stated that 'generally, there will be no future for these antiquated polluting vehicles in the

National Park System.' . . . He went on to state that 'the Park Service welcome mat is being

pulled in for snowmobiling as an acceptable form of winter recreation in our national parks.'"

Id. at 1260.  Finding that these statements displayed NEPA prejudgment, the District Court

stated:

> [T]hese comments . . . indicate a prejudged political conclusion to ban snowmobiles
> from the Parks.  Given these definite statements from the Assistant Secretary for Fish
> and Wildlife and Parks, it does not seem that the NPS could have issued any other
> rule than the one that was ultimately contained in the 2001 Snowcoach Rule.  These
> statements clearly indicate that on April 27, 2004, prior to issuance of the [Final EIS]
> or the [Record of Decision] governing winter use in the Parks, the NPS had already
> reached a prejudged political conclusion.  After that time, the issuance of the [Final
> EIS, Record of Decision] and Final Rule were nothing more than *pro forma*
> compliance with the requirements of NEPA.

Id. at 1261.

In the instant case, the Court does not find that the administrative record necessarily

indicates a prejudged political conclusion to proceed with the 10(j) classification of New Mexico

and Arizona.  Plaintiffs' citations to the comments of lower-level FWS employees do not

substantiate Plaintiffs' NEPA predetermination claim.  If anything, these citations seem to show

a range of opinions from various lower-level individuals and a general lack of understanding

concerning the legality of the proposed 10(j) classification in Arizona and New Mexico.  The

internal correspondences of non-decision makers simply do not prove NEPA predetermination.

Further, the opinions expressed by TPF employees and representatives cannot be used to prove

predetermination in this case.  TPF never hid its desire to see 10(j) classification utilized;

however, because Plaintiffs cannot provide the Court with evidence, outside of innuendo, that

TPF actually controlled the FWS decision-makers, the subjective opinion of the TPF cannot

prove NEPA prejudgment.

The Court also finds that FWS' decisions to have Michael Bean prepare a draft 10(j) rule and to show a preference for the 10(j) classification is not disallowed before finalizing the NEPA process.  Rather, such transparency allows the public to fully agree or disagree with the 10(j) proposal during the open comment period.  In fact, multiple individuals and entities voiced opinions in favor and in opposition to the 10(j) proposal.  Simply because Plaintiffs' subjective views were not adopted does not mean that the comment period was a sham, and does not mean that NEPA predetermination occurred.

Finally, the instant case is not significantly analogous to <u>Davis</u> or <u>Norton</u> to warrant this Court concluding NEPA predetermination occurred.  The grant agreement cannot be viewed as a contractual agreement.  The grant specifically notes alternative uses of the money if the 10(j) rule was not promulgated.  Although it is clear that many important people desired that 10(j) classification be granted, these subjective desires coupled with the grant do not form a contractual obligation.  Plaintiffs also cannot show that top-level FWS' decision-makers made any statement, whether public or private, absolutely foreclosing the possibility of a different NEPA result.  Again, although it is clear that many FWS employees had a preference for 10(j) classification in New Mexico and Arizona, this is merely a subjective opinion.  Asking those who work closely on such a project to mute subjective opinions would be nonsensical.  Accordingly, the Court hereby denies Plaintiffs' claim seven.

At oral arguments, all sides agreed that restoring a viable and self-sustaining population of Falcons in New Mexico and Arizona is a mutually shared objective.  In the pursuit of this goal, numerous theories on the proper approach have emerged.  These theories led to both the heated debate contained in the administrative record and the litigation currently before the Court.

Notwithstanding these emotional and vehement discussions, the Court truly hopes the mutually shared objective of restoring the Falcon population will be accomplished in short order.[17]

**IT IS THEREFORE ORDERED** that Plaintiffs Petition for Review of Agency Action (Doc. 46) is hereby denied as to claims four, five and seven.  Further, the Court hereby denies claim three as moot in regards to the states of New Mexico and Arizona.

_____
UNITED STATES DISTRICT JUDGE

_____

[17]  See Rene Romo, Giving Falcons Wings, ALB. J., Aug. 17, 2008, at B1, B4 (noting the efforts of the TPF and FWS to restore the Falcon in New Mexico).